# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 19, 2009

## LATONYA YVONNE TAYLOR v. STATE OF TENNESSEE

### Direct Appeal from the Circuit Court of Rutherford County
#### No. F-61060    Don R. Ash, Judge

---

### No.  M2008-02734-CCA-R3-PC - Filed October 2, 2009

---

A Rutherford County jury convicted the Petitioner of three counts of premeditated first degree murder, especially aggravated robbery, and two counts of especially aggravated kidnapping, and the trial court sentenced the Petitioner to life without parole plus twenty years.  The Petitioner then timely filed a petition for post-conviction relief claiming she received the ineffective assistance of counsel.  The post-conviction court denied relief after a hearing and the Petitioner now appeals. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY  L. SMITH and DAVID H. WELLES, JJ., joined.

Barry Tidwell, Murfreesboro, Tennessee, for the Petitioner, Latonya Yvonne Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Leslie E. Price, Assistant Attorney General; William Whitesell, District Attorney General for the Appellee, State of Tennessee.

## OPINION
### I.  Facts
### A.  Background

On direct appeal, this Court set forth the following summary of the facts underlying this appeal:

> This  case  concerns  the  murder  of  three  employees  of  the  Captain  D's

restaurant in Smyrna in connection with an aggravated robbery and aggravated kidnappings. These incidents occurred on July 11 or 12 of 2000. After a lengthy investigation, the [D]efendant and her cousin, Percy Palmer, were charged with the offenses. The co-defendants' trials were severed, and this appeal deals only with the [Petitioner], Latonya Taylor. . . .

Melanie Taylor, a cousin of the [Petitioner], testified that the [Petitioner] requested her to come to the Driftwood Motel in Lavergne. There the [Petitioner] introduced Ms. Taylor to Percy Palmer and discussed a plan to rob an unnamed place where the [Petitioner] claimed she had an inside contact. The [Petitioner] stated that she and Percy Palmer would be involved and that she had a gun. When Ms. Taylor declined to participate in the scheme, the [Petitioner] requested to use her car. Ms. Taylor stated that the conversation occurred during the week of July 13, 2000. She remembered that July 13 was the [Petitioner]'s birthday and that the [Petitioner] invited her to a gathering to celebrate the occasion.

Wes Mitchell, the General Manager of Captain D's in Smyrna, testified that he left the restaurant at 2:30 p.m. on July 11, 2000. Employees who remained included: Brian Speight, Assistant Manager; Scott Myers, Manager Trainee; and Troy Snell and Doug Wagner, cashiers. Mr. Mitchell explained the physical location and layout of the restaurant. It is located at 402 N. Lowry Street, flanked on the south side by a BP convenience store and service station and on the north by a Shoney's Restaurant. The Captain D's restaurant was equipped with an alarm system with panic buttons at the cash registers and the manager's desk. No surveillance cameras were present. Of the employees working, only Brian Speight had keys to the restaurant. His keys were never recovered. Mr. Mitchell stated that closing time that evening was 10:00 p.m. His inspection of the premises after the robbery indicated that the employees were about twenty minutes from finishing the cleanup. He observed no signs of a struggle within the restaurant. Approximately $1600 was taken in the robbery. A deposit bag and petty cash were still in the lower compartment of the safe. Time records on the computer indicated that Doug Wagner clocked out at 11:51 p.m. on July 11, and Troy Snell clocked out at 12:06 a.m. on July 12. Brian Speight did not clock out. Scott Myers had clocked out at 8:09 p.m. on July 11, but had obviously returned.

On cross-examination, Mr. Mitchell stated that ordinarily the closing procedures could be completed in one hour. He stated that the back door was locked magnetically at 5:00 p.m. and was then on alarm mode. The alarm, if sounded, would be audible at adjacent buildings. No driving entrances or exits from Captain D's existed except from North Lowry Street.

A cashier at Captain D's, Doug Wagner, checked out at 11:51 p.m. on July 11. He stated that Scott Myers had returned to the restaurant at 11:00 p.m. to learn

the close-out audit procedure.

Lori Ann Wagner, Doug's mother, testified concerning picking up Doug on the evening of July 11. When she first arrived, she saw a male walking by the Captain D's building. She did not see the man's face but described him as medium build, dark or brown-skinned, with dark hair, and dressed in jeans with a "Levi looking" shirt thrown over his shoulders. The man continued walking toward the mall. She saw Troy Snell and Brian Speight walking Doug to the door as he left. Ms. Wagner had never seen the [Petitioner] before trial.

Jamie Johns testified that she worked at Shoney's, adjacent to Captain D's on the night of July 11. She had known the [Petitioner] and Percy Palmer from their past work experiences at Shoney's. She stated that the [Petitioner] and Palmer came to Shoney's just before closing at 11:00 p.m. The [Petitioner] asked to borrow $50.00 from her, and Ms. Johns refused.

Gina Williams, the Assistant Manager at Shoney's, was the last employee to leave the restaurant on July 11. She testified that while leaving, she saw a black male and a black female in Captain D's. She described the female as "thick" and as wearing her hair up. The woman had a backpack or bag and was placing it on her shoulders. Ms. Williams did not see the black female's face and did not know the [Petitioner] or Percy Palmer. She stated that she set the alarm at Shoney's as she left at 12:01 a.m. on July 12. She recalled seeing five cars parked in Captain D's parking lot.

A stipulation was entered into the record from Shoney's security provider that the alarm at the Smyrna Shoney's was set at 12:01 a.m. on July 12.

Steven Heckler and his wife, Shannon, lived at Imperial Garden Apartments near the [Petitioner]'s sister, Tiffany Taylor. Mr. Heckler testified that he and his wife socialized with Tiffany and the [Petitioner]. He stated that he also knew Percy Palmer. Mr. Heckler saw the [Petitioner] and Palmer walking away from the apartments at approximately 10:45 or 11:00 p.m. on July 11. He stated that he saw them returning to the apartments about two hours later. Palmer was carrying a sack, and the [Petitioner] carried the blue duffel bag that she had when they departed. He described the duffel bag as having straps that could be used for a shoulder carry. He said the [Petitioner] ordinarily carried a change of clothes and a .380 caliber pistol in the bag. On cross-examination, Mr. Heckler said that the [Petitioner] and Palmer stated they were going to go to the BP station for beer. The two were walking at a normal pace on their return.

John Pierce was a truck driver whose job was to empty the dumpsters on his designated route in Smyrna. His route included Captain D's and K-Mart. He stated

that he emptied the dumpsters at Captain D's at approximately 2:00 a.m. on July 12. He noticed two cars parked there and noted there were usually none. Later, while at the dumpsters behind K-Mart, he saw a car with the lights on very dim. A boy was sitting in the car, apparently asleep, with the seat reclined. Mr. Pierce attempted to wake the individual with unnecessary noise but noticed no reaction. Mr. Pierce then left and notified his dispatcher to have the Smyrna Police investigate.

Wanda Jackson was the dispatcher whom Mr. Pierce notified concerning the car and its occupant behind K-Mart. She testified that she relayed the information to the Smyrna Police.

Salom Alhasmawy was employed as a night clerk at the BP station adjacent to Captain D's. He identified the [Petitioner] as having been a regular customer at the BP station. Mr. Alhasmawy stated there were four video surveillance cameras at the BP: one behind the first register, one facing the cigarette cabinet, one facing the front door, and one outside the building. The videotapes displayed the date and the time of filming. The videotapes showed the [Petitioner] and Palmer in the BP at 10:43 p.m. on July 11. The [Petitioner] was wearing blue shorts and a blue shirt. Mr. Alhasmawy said that the Captain D's was not visible from inside the BP station. He also stated that he heard no shots fired that evening.

Detective James Scott with the Smyrna Police Department testified that part of his work involved forensic video analysis. Detective Scott had slowed the time lapse videotapes to "real time." These modified tapes were shown to the jury in the segments in which the [Petitioner] and Palmer appeared and those in which Troy Snell and Scott Myers appeared. On cross-examination, Detective Scott stated the video showed the [Petitioner] and Palmer in the BP from 10:43 p.m. to 10:48 p.m.

Salom Alhasmawy was recalled and identified Troy Snell as appearing on the BP videotape at 11:14 p.m. Another individual he did not identify entered at 11:06 p.m.

Gretchen Woodruff was a patrol officer for the Smyrna Police Department. She testified that she was dispatched to K-Mart at 2:22 a.m. on July 12. Upon her arrival behind K-mart, she observed a dark green, four-door vehicle. In the driver's seat was a white male with his head turned slightly toward the passenger side. She observed a small amount of blood on his neck and his tee shirt. The vehicle was not running, and she stated that the lights did not appear to be on.

Michael Selley was the owner of Mike's Pest control. He arrived at Captain D's at 3:00 a.m. on July 12 to perform the monthly pest service. Mr. Selley used his key to unlock the front door. He observed that the alarm system had not been set. During his inspection, a police officer knocked on the window. Mr. Selley went

4

outside, and the officer inquired if there were any employees or other people in the building. Mr. Selley told the officer there were none and resumed his duties. He found a brown extension cord in the floor in front of the cook line. Mr. Selley opened the walk-in cooler and saw a body on the floor. He immediately called 9-1-1.

Brian Rowland, the night dispatcher for the Smyrna Police Department, testified that he received Wanda Jenkins' call at 2:20 a .m. and Michael Selley's call at 3:46 a.m., both on July 12.

Lieutenant Todd Spearman was supervisor of the Smyrna Police Detective Division. He testified that he responded to a dispatch to K-Mart in the early hours of July 12. At the scene behind K-Mart, he observed a person he later learned to be Troy Snell, dead in his car. After seeing a Captain D's shirt in the car, he sent an officer to the restaurant to check on other employees. Subsequently he was alerted to the crime scene at Captain D's. There he saw two bodies in the cooler, later identified as Brian Speight and Scott Myers. Mr. Myers' hands were bound by an extension cord that was also wrapped around his upper body. Lieutenant Spearman said that searches of the area between Captain D's and behind K-Mart produced no significant evidence. During the evening of July 12, Lieutenant Spearman and Tennessee Bureau of Investigation Agent Schlafly went to Tiffany Taylor's apartment at Imperial Garden Apartments to talk with the [Petitioner]. The [Petitioner] told them she had been in the Shoney's/Captain D's area the night before with a friend she called "Michael." The two had gone to Shoney's for Michael to speak with a lady named Jamie in an effort to get money from her. The [Petitioner] said she went outside and waited for Michael in the Captain D's area. The [Petitioner] said she observed two white males working in Captain D's. When Michael rejoined her, they went to the BP station. The [Petitioner]'s interview was interrupted by Percy Palmer knocking at the door. Palmer gave his name as Lee and left. The [Petitioner] then told the interviewing officers that the individual who called himself Lee was Michael. The [Petitioner] stated in her interview that she did not own a backpack.

During cross-examination, Lieutenant Spearman said there were no signs that the two victims at Captain D's had been moved to the cooler where they were found. No shell casings or expended bullets were found in the cooler.

Shannon Heckler, wife of Steven Heckler, testified that she and her husband lived next door to the [Petitioner]'s sister, Tiffany. She said the [Petitioner] stayed with Tiffany occasionally. Mrs. Heckler also knew Percy Palmer. Early in the day of July 12, the [Petitioner] woke Mrs. Heckler and requested she turn on the television news. The [Petitioner] said she would be questioned about the crime because she was black and was in the wrong place at the wrong time. The [Petitioner] then asked to do a load of laundry because her niece had nothing to wear

5

to school.  The [Petitioner] placed the laundry in the washer and left with Percy Palmer after he arrived.  Later in the day, Mrs. Heckler put the clothing in the dryer.  She noted that almost all of the clothing belonged to the [Petitioner].

Detective James Scott was sent to Imperial Garden Apartments on July 12 in search of an individual whom he later learned was Percy Palmer.  He located Palmer, who presented a California identification for Billie Gene Palmer.  He had distinctive tattoos on each arm, respectively reading "Cali" and "Killa."

Agent Dan Royse was a forensic scientist for the Tennessee Bureau of Investigation with an expertise in firearms identification.  He also served on the Violent Crime Response Team.  In this instance there were seven members on the team.  In surveying the scene at K-Mart, he stated that Troy Snell's wallet was in his lap.  The vehicle was in drive, and the victim's foot was on the brake pedal.  The ignition key was in the "on" position.  There was gas in the tank, but the car battery had expired.

At the Captain D's scene, Agent Royse first identified the two victims.  He determined that the two vehicles parked there belonged to Brian Speight and Scott Myers.  Agent Royse made a videotape of both crime scenes, which was played for the jury.  By measurement, the closest foot path between Captain D's and the site where Troy Snell was found was 1100 feet. During the inspection of the Captain D's scene, two bags of money were found in the locked portion of the safe.  The bags were marked as containing $700 and $787.81, respectively.  He did not observe any obvious signs of a struggle within Captain D's.

Agent Royse examined three long rifle .22 caliber bullets that were removed from the victims during autopsy.  The bullets all shared the same class characteristics and similar individual characteristics.  However, due to their mutilation, it was impossible to conclude whether they were fired from the same weapon.  The gunshot residue test performed on Troy Snell's hands proved negative.

On cross-examination, Agent Royse admitted that no physical evidence examined, including DNA, fingerprints, shoe prints, or other evidence, linked the [Petitioner] to the crimes.  He stated that a .22 caliber long rifle bullet cannot be fired by a .380 caliber weapon.  He also stated that the [Petitioner] and Palmer were arrested over a year after the offenses.

Linda Littlejohn was a forensic scientist at the Tennessee Bureau of Investigation Crime Laboratory.  Ms. Littlejohn performed shoe print comparisons on prints submitted to her.  She was never provided any shoes belonging to the [Petitioner] or Palmer, and no significant findings were made.

Hoyt Phillips' expertise as an employee of the Tennessee Bureau of Investigation Forensic Service Division was in processing latent fingerprint evidence. In this case he made more than one hundred comparisons. No latent fingerprints were found that matched those of the [Petitioner] or Percy Palmer.

Detective Rick Hall was an employee of the Smyrna Police Department. He testified that the television program, America's Most Wanted, was solicited to publicize this unsolved case. A segment was aired on May 19, 2001. A woman, Brooke Nason, and her boyfriend, Chris Hinds, came forward with information. The individuals were hired as paid informants. As a result, surveillance was begun by renting two adjacent rooms in motels and equipping one with audio and visual recording devices which were connected to the other room. This was done first in the Peachtree Inn in Nashville from July 5-8, 2001. Two other segments were recorded July 12-13, and July 17-19, 2001, at Ramada Inn in Nashville. Excerpts from the three sessions were played for the jury.

In one session, the [Petitioner], after claiming her noninvolvement with the Captain D's incident, admits she had "something to do with it." The [Petitioner] stated that she disposed of her gun at a pawn shop. In the same conversation, she spoke of the event as something that "rides your conscience." The [Petitioner] stated she did not want to talk about it and said, "And it makes you feel bad because there you are feeling guilty about three dead people."

Later the [Petitioner] states, ". . . it ain't no big deal. Because I'll get a lesser sentence than the ones that really killed them." The [Petitioner] relates that she told Palmer about an individual who owed her money for drugs. She stated that she was with Palmer and that he had a gun but she did not. The two of them went first to Shoney's, then to Captain D's where she said she "showed her face" and they were admitted. The [Petitioner] said she went outside to wait on Palmer and heard gun shots. She went back inside and saw two bodies bleeding and Palmer was talking to Troy Snell. She said that Palmer put the victims' bodies in the freezer and robbed them and the restaurant safe. The [Petitioner] said Troy ran out the back door with Palmer in pursuit. She went to the BP and heard a shot. Palmer rejoined her as she was walking to Imperial Garden Apartments. The [Petitioner] said that Palmer shared the robbery proceeds with her. The [Petitioner] expressed satisfaction that the police were getting false leads in their investigation.

In another session, the [Petitioner] said that Troy Snell "got his brains f-king blew out" in his car. She claimed to have already been over the railroad tracks at that time. After again discussing the money she received, the [Petitioner] acknowledged that she was an accessory to triple murder.

Later, on the one-year anniversary date of the incident, the [Petitioner] stated

7

that she might be an accessory to some murders but did not kill anyone. She said she told Troy Snell to open the door, and he did. The [Petitioner] said that Palmer had blood all over him and that he threw his clothes in the dumpster at the Imperial Garden Apartments.

In a later recorded conversation, the [Petitioner] stated that she had gotten drugs for Troy Snell and that he had owed her money. The [Petitioner] said, "It's just like I got my money anyway and three dead people, so that shit isn't funny." She said she did not know that Palmer had a gun or what kind of gun it was. She stated she did not think he threw the gun in the dumpster with his clothing.

The [Petitioner] was arrested on July 19, 2001, and was placed in a squad car equipped with an audio recording device. Ms. Nason was taken into custody with the [Petitioner]. The audiotape of their conversation was played for the jury. Ms. Nason urged the [Petitioner] to "[j]ust tell them . . . ." The [Petitioner] responded, "No, Are you crazy. You don't realize how long I'm going to jail. I could actually go to the penitentiary. I can't go there." The [Petitioner] expressed her concerns about "somebody running their mouth" and wondered if Ms. Nason's boyfriend, Chris, was the source. The [Petitioner] said that if Chris was "running his mouth, he's going to be one dead mother f-ker."

Detective Rick Hall stated that a hunt for Percy Palmer was initiated and that he was eventually found and arrested in Aurora, Colorado on August 2, 2001. On cross-examination, Detective Hall stated that Ms. Nason was paid $600 and Mr. Hinds was paid $300 as informants. Additionally, they were paid $1500 in relocation expenses. Ms. Nason had expressed her expectation of receiving $70,000 reward money in the event of a conviction.

Dr. Bruce Levy, Chief Medical Examiner for the State of Tennessee and County Medical Examiner for Davidson County, testified as an expert in anatomical, clinical, and forensic pathology. He stated that his autopsy revealed the cause of Troy Snell's death to be a single gunshot wound to the head. The wound was between the victim's right ear and eye. The fouling and stippling present on the victim led Dr. Levy to conclude the weapon was fired approximately six inches from the victim's head. No defensive wounds were observed. He ruled the nature of death as homicide.

The autopsy of Brian Speight revealed that he died of a single gunshot to the back of the head. No stippling was present, which indicated that the weapon was fired at least two feet from the victim. He ruled the manner of death as homicide.

Dr. Levy testified that Scott Myers' hands were tied "fairly tightly" by electrical cord. The cause of death was a gunshot wound to the back of the head

which severed the spinal cord and caused immediate death. No stippling was present, and he concluded the weapon was fired at least two feet from the victim. The victim had superficial abrasions to the head which Dr. Levy opined were a result of falling. The scrapes and tears found on the victim's hands indicated a struggle either with an attacker or with the binding ligature. The manner of Mr. Myers' death was also ruled as homicide.

Dr. Levy stated that one small caliber projectile was removed from each victim. He stated that in the case of Mr. Myers and Mr. Speight, the location, direction, and distance of the wounds were classified as "execution style shots," intended to kill the victim with one shot. Dr. Levy could not determine the sequence of the victims' deaths.

At the conclusion of Dr. Levy's testimony, the State rested and the defense began presenting evidence.

Agent Tom Brown, a Criminal Investigator with the Tennessee Bureau of Investigation, testified that he interviewed Gina Williams, the Shoney's employee who saw a black woman inside Captain D's on the night of the murders. He stated that she described the person as in her early to mid-twenties; approximately five feet, five inches; medium build; with her hair piled on top of her head. On cross-examination, Agent Brown said that Ms. Williams did not sign the notes he took during the interview.

The defense presented Darryl Lambert, an inmate in the penitentiary. He denied any involvement in these crimes and denied that he had told one Sally Padgett of his involvement.

Sally Padget was then called and testified that in 2000, she was addicted to cocaine. Darryl Lambert was a cocaine dealer who supplied her. Ms. Padgett testified as to what Lambert had allegedly told her concerning his involvement in the murders. Ms. Padgett admitted that she had been diagnosed as schizophrenic, had multiple personalities, and was currently on fifteen anti-psychotic medications. Ms. Padget also said, "I have no idea what I did yesterday."

The defense produced two witnesses who testified as to traffic they witnessed in the area of the K-Mart Center. Their testimony was conflicting as to times of their observation and the cars observed. Other witnesses described seeing a vehicle behind K-Mart at times ranging from 12:40 p.m. to 1:50 a.m. on July 12.

Jill Lynch testified that she saw the [Petitioner] at Imperial Garden Apartments between 10:30 p.m. and 11:00 p.m. on July 11.

9

Billy York, a resident of Imperial Garden Apartments, claimed to have seen the [Petitioner] and Palmer at the apartments in the time frame of 10:30 p.m. to 11:00 p.m. and again at 12:00 p.m. on July 11. Mr. York also stated he took a medication, Trazadone, that "makes me whackier than an old owl."

The [Petitioner] presented other witnesses who testified that they saw certain unidentified individuals in the area of the crime scene that evening. After voir dire of the [Petitioner], she elected to forego her testimony, and the defense rested.

*State v. Latonya Taylor*, M2005-00272-CCA-R3-CD, 2006 WL 2563433, *1-8 (Tenn. Crim. App., at Nashville, Aug. 25, 2006), *perm. app. denied* (Tenn. Dec. 27, 2006). Based on the evidence adduced at trial, the jury convicted the Defendant of three counts of premeditated first degree murder, one count of especially aggravated robbery, and two counts of especially aggravated kidnapping. The trial court sentenced the Defendant to life without parole plus twenty years. This Court affirmed the Defendant's convictions and sentence on direct appeal. *Id*.

### B. Post-Conviction Hearing

The Petitioner filed a timely petition for post-conviction relief claiming she received the ineffective assistance of counsel. The post-conviction court appointed counsel for the Petitioner, and it held a hearing on her petition where the Petitioner and her trial counsel testified. The Petitioner testified her trial counsel ("Counsel") failed to provide her with the effective assistance of counsel because he failed to call a potential alibi witness, failed to effectively communicate with the Petitioner, and failed to timely notify her of the Supreme Court's denial of her Rule 11 application for relief.[1]

As to her claim her Counsel failed to call a potential alibi witness, the Petitioner testified Counsel failed to call Tiffany Taylor, who, according to the Petitioner, was willing to testify that the Petitioner was at Taylor's home during the time of the crimes. The Petitioner explained that she spoke with Taylor before her trial, and Taylor told her she would testify the Petitioner was visiting her home the night of July 11 and early morning hours of July 12, 2000. The Petitioner testified she believed the outcome of her trial would have been different if Counsel had called Taylor to testify.

As to her claim that Counsel failed to adequately communicate with her, the Petitioner testified Counsel fell out of contact with her for multiple periods, which ultimately required her to complain to the Board of Professional Responsibility. The Petitioner acknowledged Counsel delivered the State's discovery materials to the Petitioner in jail as he received them. She said Counsel did not, however, adequately consult with her to determine an appropriate trial strategy. Similarly, she said Counsel did not notify her of the pre-trial motions he filed in her case. As a

---

[1] We have omitted from these facts the testimony presented pertaining to allegations not pursued by the Petitioner on appeal. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

10

consequence, the Petitioner testified, she was obliged after trial to write Counsel to request the motions filed in her case. She testified that Counsel failed to respond to these requests, and she reported his silence to the Board of Professional Responsibility, after which Counsel visited her. The Petitioner said that, although Counsel visited her "several" times in jail before trial, he failed to respond to her request that he visit her on a "few" other occasions.

The Petitioner testified she found out at the "last minute" before trial that her cousin Melanie Taylor had given a statement to police implicating her in the crimes. Also, the Petitioner testified that, before trial, she believed Dr. Keith Caruso, a psychiatrist, would testify on her behalf at trial. At trial, however, the Petitioner became aware the doctor would not be testifying because Counsel had not requested funds to obtain his services. The Petitioner also said she "had no idea" until trial that her father, mother, and sister would not be testifying on her behalf. She said that had Counsel adequately communicated with her prior to trial, notified her of the pre-trial motions he filed, and informed her of who would and would not testify at her trial, the outcome of her trial would have been different.

As to her claim Counsel failed to inform her of the Supreme Court's denial of her application for permission to appeal, the Petitioner recounted that she applied for permission to appeal after this Court affirmed her conviction and sentence on direct appeal. The Petitioner wrote Counsel inquiring into her application disposition, but he did not respond. The Petitioner then contacted Counsel's co-counsel, who responded on October 24, 2007, that the Supreme Court denied her application for permission to appeal almost eleven months earlier, on December 27, 2006. She testified Counsel next visited her in jail on December 10, 2007, and presented a petition for post-conviction relief he had prepared on her behalf, which he said he would file the next day upon her request. The Petitioner instructed Counsel to file the petition.

On cross-examination, the Petitioner acknowledged she was present in court when Counsel argued each of the pre-trial motions she complained of not being notified of and given copies of before trial. Also, she acknowledged Counsel prepared portions of her post-conviction petition, including several paragraphs that alleged Counsel failed to communicate with the Petitioner, failed to develop exculpatory proof, improperly advised the Petitioner to waive her right to testify, and failed to raise all substantive issues in the Petitioner's Motion for New Trial.

Counsel testified that he, as lead counsel, and his co-counsel represented the Petitioner in her trial, in which the death penalty was originally at issue. Counsel recalled that, after the Petitioner advised him that her sister Tiffany Taylor may have able to provide exculpatory alibi testimony, he interviewed Taylor. Counsel ultimately decided against calling Taylor for several reasons. First, Counsel found a "problem" with her statement because it either was self-contradictory or inconsistent with other accounts of the events surrounding the shooting. Second, Counsel believed Taylor had "limited mental abilities." Although he could not recall the specific problem with Taylor's statement, he explained that Taylor was the sort of witness he would not call to testify unless he "just had to" because she would perform poorly on direct and cross-examination. Counsel testified that, instead of calling Taylor to testify, he called several people to testify who had seen the

Petitioner and her co-defendant near Taylor's home rather than at Captain D's at the time of the shooting.

Counsel testified he never intended to call the Petitioner's mother and father to testify at the Petitioner's trial because neither had information relevant to the Petitioner's guilt or innocence. The Petitioner's mother testified at her sentencing hearing, but Counsel explained he did not call her father to testify at sentencing because any information he could have provided would have been duplicative of that to which her mother testified. According to Counsel, he kept the Petitioner abreast of developments in her case, and the Petitioner never complained about any particular witness's absence.

Counsel did not recall how many times he visited the Petitioner in jail. He recalled the Petitioner sent his office requests she did not appear to have authored, and he sent an investigator to speak with her about the requests. After the investigator determined a fellow inmate had prompted her to send the requests, Counsel took no further action on the requests.

Counsel acknowledged that, although the Supreme Court denied the Petitioner's application for permission to appeal on December 27, 2006, he notified the Petitioner of the denial only a few weeks before the Petitioner's one-year period to file for post-conviction relief expired. Counsel explained the omission was inadvertent and out of line with his ordinary practice. He testified he first wrote the Petitioner notifying her of the denial of her appeal, then two weeks later visited her in prison. During this visit, which he estimated to have occurred seven to ten days before the one-year limitations period on post-conviction relief expired, he provided the Petitioner with a draft of a petition for post-conviction relief. He testified that the statements included in the draft did not reflect his own view of his representation of the Petitioner but rather were the most plausible, colorable claims the Petitioner could make to preserve her post-conviction appeal.

Counsel testified he did not call Dr. Caruso to testify for three reasons. First, he was expensive. Second, the defense team had already secured the testimony of another expert, Dr. Auble, who had "better information and was the better witness to present on that issue." Third, the defense team discovered that Dr. Caruso was professionally unreliable because he had falsified information he included in a paper he published. Counsel explained that he requested the trial court authorize funding for a second expert, who specialized in coerced confessions, but the trial court denied his request.

Counsel recalled that, two weeks before trial, the State obtained and promptly reported to Counsel a statement from Melanie Taylor. According to Counsel, Taylor's statement indicated that the Petitioner and Taylor robbed an Arby's at gunpoint several months before the robbery underlying this appeal. Taylor's statement also indicated that, several weeks before the robbery at issue, the Petitioner invited Taylor to participate in another robbery. At trial, Taylor testified only that the Petitioner had solicited her help in a robbery. Counsel said he did not seek to continue the trial after he became aware of Taylor's testimony because he could conceive of no way to diminish the effect of Taylor's testimony. Counsel did not interview Taylor before trial.

12

On cross-examination, Counsel testified he had practiced criminal defense for fifteen years, during which time he had participated in fifteen to twenty capital cases, four of which went to trial. He estimated he spent between 900 and 1500 hours on the Petitioner's case. He testified he and his co-counsel were prepared for the Petitioner's trial, had adequate time and discovery material, and fully developed each significant area of the Petitioner's defense. He testified that he considered his representation of the Petitioner to be a "win" because the Petitioner did not receive the death penalty.

Counsel testified he did not recall that the Petitioner ever requested to testify at her trial. He testified that he and his co-counsel informed the Petitioner she could testify, but she did not necessarily need to testify. Counsel said he did not want the Petitioner to testify because the defense team was arguing the Petitioner was mentally retarded, and the Petitioner could harm this image by testifying.

At the conclusion of the post-conviction hearing, the post-conviction court found that Counsel was not "deficient in any way" and that, given the strength of the evidence against the Petitioner, any conceivable deficiency did not prejudice the Petitioner. Accordingly, the post-conviction court denied the petition for post-conviction relief and later issued a written order to that effect. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that she is entitled to post-conviction relief because Counsel: (1) failed to call a potential alibi witness; (2) failed to effectively communicate with her; and (3) failed to timely notify her of the Supreme Court's denial of her Rule 11 application for relief.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999);

13

*Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House,* 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then

14

the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, the post-conviction court concluded at the end of the post-conviction hearing that Counsel was not deficient "in any way" and that any conceivable deficiency did not prejudice the Petitioner. In the written order it later issued denying post-conviction relief, it noted that, having presided over the Petitioner's trial, it recalled that Counsel thoroughly and competently represented the Petitioner. The post-conviction court further concluded that nothing in the record and post-conviction hearing testimony "cast doubt on the effectiveness" of Counsel's representation of the Petitioner. As such, the post-conviction court denied the petition for post-conviction relief. Because the post-conviction court's order disposing of the petitioner's ineffective assistance of counsel claim consists only of a conclusion of law, we review its conclusion de novo. *Fields*, 40 S.W.3d at 457. In reviewing the Petitioner's claim of ineffective assistance of counsel de novo, we address each of the objections to Counsel's representations she maintains on appeal.

### A. Decision not to Call Tiffany Taylor as Alibi Witness

The Petitioner contends Counsel provided the ineffective assistance of counsel when he chose not to call Tiffany Taylor to testify as an alibi witness at the Petitioner's trial. According to the Petitioner, Taylor would have testified that the Petitioner was at Taylor's home during the time of the murders underlying this appeal. Counsel explained, however, that parts of Taylor's testimony were problematic, in that they either were self-contradictory or conflicted with other trial accounts of the murders. Also, Counsel believed that, because Taylor was somewhat mentally handicapped, her testimony would be less credible and she would perform poorly on cross-examination. Unwilling to call Taylor to testify, Counsel instead called several witnesses who testified to having seen the Petitioner near Taylor's home during the time of the murders.

In sum, Counsel evaluated the strength of Taylor's testimony, its potential pitfalls, and chose not to present her testimony. He sought instead to introduce the information to which Taylor would have testified through the testimony of several more competent witnesses. Taking into account all relevant circumstances, we conclude Counsel's decision not to call Taylor to testify was a did not fall below "an objective standard of reasonableness." *Strickland,* 466 U.S. at 690; *Mitchell*, 753 S.W.2d at 149; *House*, 44 S.W.3d at 515. The Petitioner is not entitled to relief on this issue.

### B. Counsel's Communication with the Petitioner

The Petitioner next contends that Counsel failed to adequately confer with her and keep her abreast of developments with her trial and appeal. Although she acknowledges that Counsel visited her several times in prison, she complains that he failed to consult adequately with her about trial strategy and to visit her on several occasions on which she requested his presence. Also, she

complains that, had Counsel conferred with her more often, she would have been aware that pre-trial motions were filed in her case and that her family and Dr. Caruso would not testify at her trial. The Petitioner also testified that she believed Counsel failed to request funding for Dr. Caruso. Counsel testified that he visited the Petitioner regularly, consistently included her in discussions of trial strategy, and provided her with the State's discovery material as he received it. He explained that her family did not testify at trial because they possessed no knowledge relevant to her guilt or innocence but that her mother testified her sentencing hearing. Counsel explained Dr. Caruso did not testify because his services were expensive, the defense team was able to secure similar testimony from Dr. Auble, and Dr. Caruso had had a poor professional reputation. Finally, Counsel recalled that the Petitioner never voiced concerns to him about being left out of trial preparation or about the absence of her family and Dr. Caruso's testimony.

In our view, Counsel adequately communicated with the Petitioner, included her in discussions of trial strategy, and informed her of the testimony her defense would present at trial. As such, we conclude that Counsel's representation was reasonable and well within the range of competence demanded of attorneys in criminal cases. *See Baxter*, 523 S.W.2d at 936. The Petitioner is not entitled to relief on this issue.

### C. Notification of Denial of Application to Appeal

The Petitioner lastly contends Counsel was ineffective because he failed to promptly notify her of our Supreme Court's denial of her application for permission to appeal. Indeed, as Counsel conceded, he neglected for approximately eleven months to notify the Petitioner of the denial of her application. A prisoner must file his or her petition for post-conviction relief within one year of the final disposition of his or her direct appeal. T.C.A. § 40-30-102(a). After Counsel sent his initial notification of the denial by letter, he then visited the Petitioner in prison approximately seven to ten days before the expiration of the one-year limitation period. On this visit, he brought the Petitioner a draft he had prepared of a petition for post-conviction relief that included all claims Counsel believed were colorable. In addition to Counsel's draft, the Petitioner had previously obtained a draft of a petition for post-conviction relief from another source. The petition underlying this appeal was soon thereafter filed before the one-year limitations period expired.

We conclude Counsel waited an unreasonable amount of time before notifying the Petitioner of the disposition of her application to appeal this Court's opinion affirming her convictions. The final disposition of the Petitioner's convictions triggers several limitations periods during which she must file for collateral relief. Counsel's delay, therefore, reduced the amount of time during which he could discuss with the Petitioner her option to pursue post-conviction remedies. As such, Counsel's failure fell below an objective standard of reasonableness expected of attorneys in criminal cases. *See Baxter*, 523 S.W.2d at 936. In this case, however, the Petitioner fails to show by clear and convincing evidence how Counsel's delay prejudiced her. The Petitioner evidently had contemplated and prepared for filing for post-conviction relief before Counsel visited her in prison and brought her the draft petition he had prepared. Also, the Petitioner's petition was ultimately timely filed, post-conviction counsel was appointed, and post-conviction counsel had the opportunity

16

to amend the original petition. Given the lack of evidence that Counsel's failure caused the Petitioner to miss a filing deadline, we conclude the record does not show by clear and convincing evidence that Counsel's conduct prejudiced the Petitioner. *See Strickland,* 466 U.S. at 694. As such, she is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the Petitioner received the effective assistance of counsel. Accordingly, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE